**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TF GLOBAL MARKETS (AUST) LIMITED and ACG MANAGEMENT SOLUTIONS LLC,** | |
| **Plaintiffs,** | **NO. 21-cv-208** |
| **v.** | |
| **JAMES SORENSON,** | |
| **Defendant.** | |

## VERIFIED COMPLAINT

Plaintiffs TF Global Markets (Aust) Limited ("TF Aust") and ACG Management Solutions LLC ("ACG") (collectively, "ThinkMarkets" or "Plaintiffs") file this Verified Complaint against James Sorenson ("Sorenson" or "Defendant"). In support thereof, ThinkMarkets states as follows:

## INTRODUCTION

1.     Sorenson is a hostile former employee of ThinkMarkets, who served in high-level information technology ("IT") roles with high-level security access, and who is refusing to return ThinkMarkets' confidential and trade secret information. Moreover, ThinkMarkets has learned that Sorenson now works for a conglomerate, IS Group (defined below), that not only competes against ThinkMarkets but is a long-running litigation adversary involved in multiple, active disputes against ThinkMarkets.

2.     Most concerning, a review of Sorenson's email revealed that he has an email in his Outlook inbox that is a confidential and privileged attorney communication that *relates directly to that underlying litigation* – an email of which Sorenson was not a sender or recipient

and which he has no legitimate reason to have in his possession. It appears that Sorenson has wrongfully and unlawfully obtained this email from ThinkMarkets' Senior Director of Legal & Compliance, and ThinkMarkets is highly concerned that, among other things, Sorenson has disclosed or will disclose it to his new employer in order to, among other benefits, secure his new employment and otherwise harm ThinkMarkets.

3. Further, a forensic investigation of Sorenson's Outlook email revealed multiple additional emails with confidential, proprietary, competitive, sensitive, client, human resources, and/or privileged information that similarly he had no legitimate reason to possess.

4. For example, Sorenson has emails relating to communications between ThinkMarkets and its regulator in the United Kingdom ("UK"), to ThinkMarkets' efforts to launch a new business in Japan, to ThinkMarkets' efforts to start a new line of business in Australia, and to potential claims, counterclaims and settlement discussions involving a dispute with another third-party. Again, Sorenson was not a sender or recipient of these messages, was not authorized to access them, and he has no legitimate business reason to have them in his email.

5. Additionally, a further investigation shows that, near the time he resigned, Sorenson deleted a certain IT repository in a proprietary application that stored proprietary code. It appears that Sorenson deleted this repository improperly, without authorization, to cause harm to the business, and/or take the latest work with him as he left ThinkMarkets.

6. Sorenson refuses to return all ThinkMarkets information and property in his possession despite multiple requests by ThinkMarkets to do so and despite his contractual obligations to do so. Given his technical expertise and knowledge, his deletion of ThinkMarkets' information, as well as his improper possession of ThinkMarkets' confidential, privileged, and trade secret information, Sorenson is a continuing threat to the business of ThinkMarkets.

Accordingly, ThinkMarkets has no choice but to file the instant action to prevent further harm by Sorenson and/or his subsequent employer.

## PARTIES AND BACKGROUND ALLEGATIONS

7.      TF Aust, with subsidiaries, is a leading online brokerage firm under the trade name and brand ThinkMarkets that, among other things, provides clients around the world with access to a wide range of global markets.  ThinkMarkets operates in the financial services and financial technology ("fintech") industries.

8.      TF Aust is Australian corporation with its principal place of business in Melbourne, Australia.  ACG is a wholly-owned subsidiary of TF Aust; is an Illinois limited liability company with one member, TF Aust; is headquartered in Chicago, Illinois; provides certain support for TF Aust and its subsidiaries/affiliates; and employed Sorenson to provide certain IT-related services for TF Aust and its subsidiaries/affiliates under the global trade name and brand ThinkMarkets.  TF Aust and ACG are citizens of Australia.

9.      Sorenson is a citizen of Michigan, and, upon information and belief, currently resides at 2760 East Bluewater Highway, Ionia, Michigan, 48846.  Sorenson worked for ThinkMarkets or its affiliates from about December 14, 2015 to October 2, 2020 in high-level IT network engineering, security, and architecture roles.  Most recently, Sorenson held the title of Senior Network Architect for ThinkMarkets.  In these roles, Sorenson had access to ThinkMarkets' critical confidential and proprietary technologies, applications, data, networks, systems, security information, and trade secrets, as well as indirect security access to every email account in TF Aust and its subsidiaries/affiliates.  This confidential information included code, confidential trading strategies, and information technology developments designed to improve ThinkMarkets' systems, applications, and business.

10.     As a condition of his employment with ThinkMarkets, Sorenson executed certain Employment Agreements, with the most recent being effective on February 13, 2020 (the "Agreement"), which contained, among other provisions, certain non-disclosure and property return provisions.  A copy of the Agreement is attached hereto as **Exhibit A**.

11.     IS Risk Analytics ("ISR") provides certain risk management service focused technology and services to brokers.

12.     ISR and its affiliate IS Prime Limited ("ISP") are subsidiaries of ISAM Funds (UK) Limited ("ISAM").  Collectively, ISAM, ISP, and ISR are referred to as "IS Group."  IS Group is in the financial services and fintech industries.

13.     Since 2018, IS Group has initiated multiple court and arbitration proceedings against various ThinkMarkets related entities and individuals.  Presently, the litigation between IS Group and ThinkMarkets includes two arbitrations and four pending lawsuits involving multiple claims and counterclaims in multiple jurisdictions (the UK, Florida, and Michigan). These disputes originate from a series of January 2017 transactions between the two sides, including the sale of a certain assets and a business line in Grand Rapids, Michigan from a TF Aust subsidiary/affiliate (called Think Liquidity LLC ("Think Liquidity")) to ISR.  The litigation remains active and ongoing.

14.     Additionally, as ThinkMarkets and IS Group are both in the financial services and fintech industries, IS Group competes against ThinkMarkets in multiple ways,[1] including in

---

[1] In connection with Think Liquidity's aforementioned. sale of certain assets and a business line to IS Risk in 2017, Think Liquidity signed a limited covenant that restricts Think Liquidity from competing with IS Risk only in IS Risk's provision of three specific, enumerated services: (i) risk management services, (ii) MT4/hosting services, and (iii) STP Bridging services—and no others.  This limited covenant expires January 19, 2021.  There is active separate litigation and arbitration in Michigan and Florida related to that covenant; TF Aust, for itself and its subsidiaries, affiliates, officers, and employees, reserves all, and does not waive or concede any, rights, claims, defenses, facts, arguments, and/or objections related to those separate disputes.  Aside from that limited covenant on Think Liquidity in favor of IS Risk, there are multiple other ways that IS Group competes against ThinkMarkets in broader financial services and fintech marketplaces and where Sorenson possesses ThinkMarkets confidential and trade secret information that is competitively valuable to IS Group.

technology and related aspects of the business that fit squarely within Sorenson's job responsibilities, training, and access during his ThinkMarkets employment.

15.     Sorenson abruptly resigned from ThinkMarkets without notice on October 2, 2020. On or about October 6, 2020, ThinkMarkets sent Sorenson a letter reviewing his post-employment contractual obligations to ThinkMarkets and asking him to return all ThinkMarkets' property, return a Termination Certificate, and disclose his new employer to ThinkMarkets' Human Resources. Sorenson never did.

16.     By December 2020, ThinkMarkets learned and confirmed that Sorenson became employed by its competitor and litigation adversary IS Group, specifically/directly ISR.

17.     ThinkMarkets then conducted a forensic investigation of his Outlook email, and it showed that Sorenson possessed dozens of sensitive emails that should not have been in his email—i.e., Sorenson did not send these emails, nor was he an intended recipient via the to, cc, or bcc lines. In short, for apparently malicious purposes and without authorization, Sorenson used his IT administrative privileges to secretly obtain ThinkMarkets emails with confidential, proprietary, competitive, sensitive, client, human resources, and even attorney-client privileged information for no legitimate business reason.

18.     Of these dozens of emails, five examples best illustrate the threat and harm of Sorenson's wrongful possession of these emails, particularly now as an IS Group employee.

19.     *First* and most critically, Sorenson's inbox contains a confidential, privileged, and work-product email from Adil Siddiqui, Senior Director Legal & Compliance for ThinkMarkets based in the UK to its external counsel at a law firm in London about ThinkMarkets' litigation with Sorenson's new employer, IS Group. This email (without waiving any rights, privileges, and protections for this email given the ongoing litigation between ThinkMarkets and IS Group) details highly-sensitive litigation plans, analysis, and strategies against IS Group and contains

extremely-sensitive attachments. Simply stated, this email could not be more sensitive vis-à-vis ThinkMarkets plans and strategies for ongoing litigation and arbitration against IS Group, Sorenson's current employer.

20.     There is a substantial threat that Sorenson has disclosed or will disclose (orally and/or in writing) this email and/or information therein and/or attached thereto to IS Group and/or its officers/employees, such as Jeffrey Wilkins, Jonathan Brewer, Raj Sitlani, Alexander Lowe, and/or Roy Sher.

21.     *Second*, Sorenson's inbox contains a confidential email between Mr. Siddiqui and ThinkMarkets' UK regulator, the Financial Conduct Authority ("FCA"), regarding the ongoing arbitration between IS Group and ThinkMarkets. Such regulatory communications are kept in confidence, and, given the nature of this particular inquiry, this email contains candid and sensitive details about IS Group and the arbitration with IS Group that were intended solely for the FCA.

22.     In the hands of IS Group (including now, Sorenson) and/or its external counsel currently litigating against ThinkMarkets, this email and/or the information therein would be highly prejudicial to ThinkMarkets because it details ThinkMarkets' candid, confidential comments and assessments to the regulator about the continuing arbitration with IS Group and matters therein. Moreover, Sorenson obtaining and holding such a regulatory communication that was not addressed to him in his email appears to carry prospective malicious intent to harm ThinkMarkets.

23.     *Third*, Sorenson's inbox contains a series of sensitive emails regarding ThinkMarkets' efforts to launch a business in Japan that he was not a designated recipient or sender on. Most concerning, two are privileged attorney-client communications between ThinkMarkets' external counsel at a law firm in Tokyo and Mr. Siddiqui and another

ThinkMarkets employee. The series further involves sensitive and personal human resources matters related to founding a Tokyo office. Moreover, the series details confidential plans and strategies for establishing a Japan-based financial services business in the highly-competitive foreign exchange ("FX") trading industry in which ThinkMarkets and IS Group operate. IS Group does not currently have an office in Japan, and ThinkMarkets spent substantial time and resources preparing to launch its Japan-based business.

24.    It is, among other things, commercially and competitively prejudicial to ThinkMarkets for such plans to be in Sorenson's possession, especially as now an IS Group employee. These emails and the information therein would be of commercial and competitive value to IS Group in seeing how ThinkMarkets went about starting a business in Japan, which is a difficult FX market to penetrate. Further, Sorenson obtaining and holding such privileged and confidential communications in his email regarding a new-country launch appears to carry at least an intent to prejudice ThinkMarkets and/or help IS Group.

25.    *Fourth*, Sorenson's inbox contains a sensitive email between Mr. Siddiqui and a counterparty in Europe that includes threatened claims and counterclaims that were sensitive in nature and includes confidential settlement discussions. Sorenson obtaining and holding such a communication appears to carry at least prospective malicious intent to harm ThinkMarkets.

26.    *Fifth*, Sorenson's inbox contains a series of confidential emails regarding ThinkMarkets' efforts to launch a new business line: stock trading for Australian clients. These emails detail commercially-sensitive marketing plans, strategies, and decision-making on a new and competitive business launch. Sorenson obtaining and holding such business-sensitive emails about efforts to launch, market, and establish a new product line appears to carry at least an intent to prejudice ThinkMarkets in the marketplace.

27.     Given Sorenson's deletion of a code repository shortly before his resignation, ThinkMarkets has every reason to believe that these emails are only the tip of the iceberg, and that in order to cover his tracks, Sorenson also likely has deleted many more emails that he never should have accessed.

28.     After learning of the above and his role with IS Group, ThinkMarkets again contacted Sorenson to request that he return all ThinkMarkets property, including its confidential and trade secret information.  ThinkMarkets also requested that Sorenson provide the laptop and any other devices he used to perform work for ThinkMarkets to a third-party forensic vendor for imaging and investigation.  Sorenson has failed to do so.

29.     Unless the relief requested herein is granted by the Court, Sorenson will continue wrongly and unlawfully possess, access, disclose, and/or use ThinkMarkets' confidential, proprietary, competitive, sensitive, privileged, and/or trade secret information.  ThinkMarkets therefore seeks preliminary and permanent injunctive relief to protect its valuable confidential proprietary, competitive, sensitive, privileged, and/or trade secret information.

30.     ThinkMarkets will suffer irreparable harm for which it cannot be adequately compensated by monetary damages alone if the preliminary and permanent injunctive relief requested herein is not granted.

## JURISDICTION AND VENUE

31.     This Court has original federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over this action because ThinkMarkets pleads a claim pursuant to the federal Defend Trade Secrets Act ("DTSA"), which expressly authorizes original claims in the federal district court.

32.     This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over the other state claims alleged herein because those claims are related to the federal DTSA claim and form part of the same case or controversy.

33.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (1) ThinkMarkets seeks injunctive relief and recovery of damages, which together exceed the amount in controversy threshold of $75,000, exclusive of interest and costs, and (2) because this action is between citizens of a State (as defined in 28 U.S.C. § 1332) and a foreign state.

34.     Venue is proper in Illinois.  A substantial part of the events or omissions giving rise to the claims occurred in this venue, and Sorenson is subject to personal jurisdiction in this venue.  ACG is headquartered in Illinois, some of the misappropriated trade secrets are stored in Illinois, and ThinkMarkets has been and will be harmed in Illinois.  Sorenson worked for ACG (which is in Illinois), reported to individuals living in Illinois, and traveled to Illinois for his work.

35.     Sorenson is subject to personal jurisdiction and venue in Illinois as a result of the forum selection clause contained in the Agreement, which states "[e]ach party consents to the exclusive jurisdiction and venue of the state or federal courts in Cook County Illinois, if applicable, in any action, suit, or proceeding arising out of or relating to this Agreement."  This paragraph also provides for the application of Illinois law in construing the Agreement.

## **SORENSON'S EMPLOYMENT**

36.     During his employment, Sorenson held several senior network engineering and network architecture roles for ThinkMarkets.  Sorenson's duties included global management of multiple projects for ThinkMarkets, including in Chicago, Australia, and the United Kingdom.

37.     At the time he signed this most recent Agreement effective February 2020, Sorenson held the role of Senior Network Engineer.  In April 2020, ThinkMarkets promoted Sorenson to the role of Senior Network Architect, and Sorenson received a raise in base salary to $170,000 per year.

38.     Sorenson initially worked for the portion of the ThinkMarkets business in Grand Rapids that a TF Aust subsidiary (Think Liquidity) sold to IS Group in January 2017.  Unlike certain other employees who moved to IS Group with that business and became IS Group employees in January 2017, Sorenson stayed with ThinkMarkets after that January 2017 transaction.  Thereafter, Sorenson worked remotely in Michigan for ThinkMarkets globally and ACG in Chicago directly.

39.     Before and after his April 2020 promotion, Sorenson's job centered on ThinkMarkets' confidential and proprietary technologies, data, security, and trade secrets, including the networks, data, source code, confidential trading strategies, and technologies constituting, underlying, and supporting ThinkMarkets' proprietary ThinkTrader platform as well as its MetaTrader4, Metatrader5, and other applications.  Sorenson did not just have access to this information; he actively worked to create and improve it.  For example, Sorenson's job description included responsibility for "network architecture," "system security," and "customer facing applications."  *See* **Exhibit A**.

40.     As part of his April 2020 promotion, Sorenson's responsibilities expanded to include "proprietary web applications," "pricing engines," and "code…to support the company's vital business."

41.     In his technology and security roles for ThinkMarkets, Sorenson also had access to confidential and proprietary information of ThinkMarkets, including direct or indirect access to the email of all personnel of ThinkMarkets, to be used only for legitimate business purposes.

## THE EMPLOYMENT AGREEMENT

42.     As a condition of his employment with ThinkMarkets and as a condition to receiving access to ThinkMarkets' confidential and trade secret information, Sorenson signed multiple employment agreements, each containing certain confidentiality and non-disclosure provisions.  Thus, at all times during his employment with ThinkMarkets, Sorenson was subject to confidentiality and non-disclosure requirements, to which he agreed.

43.     In consideration for his continued employment and other valuable consideration, most recently Sorenson executed the Agreement, which had an effective date of February 13, 2020. *See* **Exhibit A**.

44.     Section 1(d) of the Agreement requires Sorenson to "use reasonable best efforts to faithfully perform [his] responsibilities in a diligent, trustworthy, and businesslike manner so as to advance the best interests of the company."

45.     Section 3(a) of the Agreement requires Sorenson to return all ThinkMarkets property and equipment within three (3) days of the termination of his employment

46.     Section 5 of the Agreement contains several key provisions with respect to ThinkMarkets' confidential information.  In Section 5(a), Sorenson acknowledges that during the course of his employment, he will gain access to ThinkMarkets' Confidential Information (as defined in Section 5(b)) and agrees that he will not use any Confidential Information other than in furtherance of his legitimate job duties in order to ensure that ThinkMarkets retains its value and goodwill.

47.     Section 5(b) defines the term "Confidential Information" to include, by way of example, "scientific or technical information concerning the Company's products and services;" "trade secrets as defined by applicable state and federal law;" "formulas;" "designs;" "methods;"

"product development;" "codes;" "computer applications, programs, designs, and software;" "trading processes and techniques;" and "financial and sales performance data."

48.     Section 5(d) requires Sorenson to "take every reasonable step to maintain the security, confidentiality and integrity of all Confidential Information and to comply with all of the Company's policies for the protection of Confidential Information."   In Section 5(d), Sorenson also agreed not to disclose any Confidential Information to anyone outside the Company except with the written consent of the Company."

49.     Further, Section 5(d) requires Sorenson to, upon the termination of his employment with ThinkMarkets, deliver to ThinkMarkets any and all Confidential Information and other property of the Company in his possession.

50.     Section 8 of the Agreement contains certain non-competition and non-solicitation covenants, including Sorenson's agreement for a period of twenty-four (24) months post-employment not to provide "Services" (defined as business activities that are the same or substantially similar to those that Sorenson provided to ThinkMarkets as part of his job duties) within certain geographic areas to any enterprise that directly or indirectly competes with ThinkMarkets.

51.     With his executed contract in place, ThinkMarkets gave Sorenson access to its most vital confidential and trade secret information.

52.     ThinkMarkets insisted upon Sorenson's agreement to written confidentiality agreements, including the Agreement as a precondition to giving him access to the confidential information described above.  The provision of such information benefitted Sorenson.

53.      While performing services for ThinkMarkets, Sorenson utilized all of the confidential and trade secret information described above.  Sorenson did not just have access to this information, he used it every single day in order to perform his job duties and

responsibilities. Sorenson could not have performed any of this work on behalf of ThinkMarkets without such information, and Sorenson would not have learned or otherwise had access to such information but for his association with ThinkMarkets. Such information is valuable and has been acquired through the expenditure of significant resources by ThinkMarkets.

54. By signing the Agreement, Sorenson acknowledged the confidential and trade secret nature of the information described above and agreed not to misappropriate such information in any way.

55. In addition to the contractual confidentiality and non-disclosure restrictions that ThinkMarkets required of Sorenson and its other employees, ThinkMarkets took, and still takes, several additional measures to guard against the unauthorized disclosure of its confidential and trade secret information. For instance, all access to ThinkMarkets' network or systems requires the use of a password. Also, ThinkMarkets maintains robust policies relating to the proper use of its computer equipment, internet, and email, as well as maintaining data security. These policies are contained in its Employee Handbook and as part of its Internet Acceptable Use Policy, which it requires all employees to follow.

**SORENSON BECOMES DISGRUNTLED AND RESIGNS WITHOUT NOTICE**

56. By at least January 2020, Sorenson began regularly complaining within ThinkMarkets about his job and his co-workers.

57. Among other earlier matters, Sorenson's complaints appeared to stem, at least in part, from ThinkMarkets' hiring in January 2020 of its first CTO to supervise all technology functions and all technology personnel, including Sorenson. Whether Sorenson did not like who was hired, the fact that there was a CTO overseeing him (*i.e.*, he no longer reported directly to the CEO), or the fact that Sorenson himself was not the CTO, Sorenson immediately became hostile to the CTO and others.

58.     ThinkMarkets remained committed to trying to maintain a productive employment relationship with Sorenson.

59.     To that end, ThinkMarkets gave Sorenson an additional promotion and a significant raise in April 2020.  *See* April 28, 2020 Letter attached as **Exhibit B**.

60.     Unfortunately, despite these efforts by ThinkMarkets, the relationship with Sorenson continued to deteriorate due to his complaints and refusal to follow directives of the company.  For example, ThinkMarkets requested that Sorenson work in the Chicago office for team-building and collaboration improvement purposes, but he refused.

61.     This deterioration was exacerbated by Sorenson's refusal to use a company-issued computer/hardware.  Because Sorenson was a legacy remote employee before the formal establishment of ThinkMarkets' Chicago office in 2017, he used his own personal laptop/hardware to conduct company business.  This included working on source code locally on his personal laptop(s)/hardware and used his personal laptop(s)/hardware (and likely also external/flash drives or other external sources/media) to store ThinkMarkets' information.  In 2020, for security purposes, ThinkMarkets demanded that Sorenson instead use a company laptop/hardware to conduct company business.  He refused.

62.     On October 2, 2020, Sorenson resigned without providing any notice.  Sorenson resigned effective immediately, despite his senior role and despite the fact that Section 7(a) of his Agreement provides for enhanced compensation if he were to provide thirty (30) days' notice of his resignation.

63.     On or about October 6, 2020[2], ThinkMarkets' Head of Corporate Services, Bill Vernon, sent a letter to Sorenson requesting the return of all ThinkMarkets' property, reminding

---

[2] This letter is mis-dated August 17, 2020, but clearly refers to Sorenson's October 2 resignation.  FedEx Records show it was received at Sorenson's address on October 8, 2020.

him of his obligation not to disclose any confidential information or trade secrets of ThinkMarkets, requesting that Sorenson complete the attached Termination Certification, and to keep ThinkMarkets' Human Resources apprised of any address or job changes.

64.     Sorenson failed to respond to Mr. Vernon's letter and failed to return the Termination Certification.

65.     By December 2020, ThinkMarkets learned and confirmed that Sorenson was employed with competitor and litigation adversary IS Group, specifically/directly ISR.

## THINKMARKETS' DISCOVERY OF IMPROPER EMAILS IN SORENSON'S OUTLOOK

66.     The fact that Sorenson had joined part of IS Group was of particular concern to ThinkMarkets.  Not only does IS Group compete with aspects of TF Aust's global financial services and financial technology business, but IS Group also is TF Aust's ongoing litigation adversary.

67.     Upon learning of Sorenson's employment with ISR, ThinkMarkets immediately began to investigate Sorenson's network activity and email in order to ensure that its confidential and trade secret information had not been improperly disclosed.  This investigation was hindered by the fact that Sorenson refused to work on a company laptop, but rather worked on his personal laptop(s), which he retains.  Therefore, ThinkMarkets does not currently have an image of the laptop(s) Sorenson was using at the time of his departure.

68.     Upon information and belief, Sorenson also has used the domain name "sonicrat.org" and has utilized the email address sonicrat@gmail.com and james@sonicrat.org to send ThinkMarkets' confidential information.

69.     ThinkMarkets' investigation included retention of Jonathan Karchmer, a third-party forensic expert with iDiscovery Solutions ("iDS"), to examine Sorenson's Microsoft Office 365 (O365) email box.

70.     In this investigation, dozens of messages were found in Sorenson's Outlook email on which he was neither a sender nor a recipient.  These emails do not directly relate to Sorenson's job duties, and he had no legitimate business reason to have them.

71.     Most alarmingly, ThinkMarkets found a privileged email dated January 7, 2020, from Mr. Siddiqui to ThinkMarkets' external counsel at a law firm in London about ThinkMarkets' litigation with Sorenson's new employer, IS Group.  As stated above, without waiving any rights, privileges, and protections, this email contains highly-sensitive litigation plans, analysis, and strategies against IS Group and also included confidential attachments, including selected emails supporting to TF Aust's claims against IS Group.  Mr. Siddiqui did not send the email to Sorenson, and Sorenson had no legitimate reason to have this email in his inbox.  In the hands of IS Group, this email is incredibly damaging to ThinkMarkets with respect to the underlying litigation, as it gives IS Group insight into ThinkMarkets' privileged communications, strategies and analysis.

72.     Moreover, as set forth above, Mr. Karchmer found multiple additional emails containing confidential, proprietary and sensitive information, including attorney-client privileged communications.   For example, these emails included emails relating to communications between ThinkMarkets and the FCA, to ThinkMarkets' efforts to launch a new business in Japan, to ThinkMarkets' efforts to start a new line of business in Australia, and to potential claims, counterclaims and settlement discussions involving a dispute with another third-party.

73. It appears that Sorenson wrongfully used his security access to obtain these emails, and likely other information, and ThinkMarkets has legitimate concerns that he has disclosed or will disclosed them to IS Group.

74. Mr. Karchmer's forensic examination included review of email metadata showing that Sorenson was not the original sender or an intended recipient, nor was he designated as an intended blind copy (or BCC) recipient of these messages.

## SORENSON INEVITABLY WILL DISCLOSE THINKMARKETS' TRADE SECRETS TO IS GROUP

75. As part of his employment duties, Sorenson helped develop/improve/advance and had access to trade secrets and other confidential and proprietary information of ThinkMarkets that is competitively valuable to IS Group. For example, Sorenson's job responsibilities included developing "proprietary web applications" and "code…to support the company's vital business."

76. Given the scope and nature of Sorenson's job for ThinkMarkets and now IS Group, certain ThinkMarkets trade secrets and other confidential and proprietary information has been wrongly compromised and/or is in immediate jeopardy of being wrongly compromised because Sorenson has inevitably disclosed or will inevitably disclose this information to IS Group in his work for IS Group. Five examples illustrate the reality and threat of Sorenson's inevitable disclosure.

77. As an introductory matter, ThinkMarkets has created a proprietary IT system/application called Eclipse. Eclipse is an analytical and algorithmic application that processes massive amounts of business, pricing and other data that is the core of ThinkMarkets' FX and other trading businesses. Eclipse is a one-of-a-kind, quantitative fintech tool that makes ThinkMarkets ThinkMarkets because—in a trading business where milliseconds matter—Eclipse

gives ThinkMarkets a unique, competitive edge in rapidly identifying trends and synthesizing information flows into a successful trading business.

78.     The *first* example of Sorenson's inevitable disclosure is Eclipse's underlying network architecture and engineering.  Eclipse's network architecture and engineering is a critical, unique aspect of Eclipse.  A central part of Sorenson's ThinkMarkets training and job focused on improving, developing, designing, building, and maintaining Eclipse's network architecture and engineering and its intimate inner workings.  Sorenson's new employer, IS Group, similarly tries to make money like ThinkMarkets does in analytical, quantitative trading. For instance, ISAM's website states that it uses a "trend following system trading over 300 global financial and commodity futures markets" and "aims to capture profits from market divergence, utilising adaptive trend-seeking methods."  See  https://www.isamfunds.com/. Likewise, in an January 2015 *eForex* article, ISAM admitted that it prefers FX over other asset classes to "due to the superior cross margining and risk management benefits" and it focuses on "building and managing an eFX business," including "real time monitor[ing of its] risk and [its] our margin" which directly aligns with Sorenson's work for ThinkMarkets.  *See* http://e-forex.net/articles/jan-2015-isam-a-world-leading-systematic-hedge-fund-with-a-strong-pedigree-in-quantitative-research-and-technology.html.

79.     Given the nature of his technology roles at ThinkMarkets and now IS Group, upon information and belief Sorenson, as part of his regular duties for IS Group, will inevitably, at minimum, use ThinkMarkets' proprietary architectural and engineering secrets and cutting-edge know-how.  Through Sorenson, IS Group can now wrongly gain and use ThinkMarkets' proprietary architectural and engineering secrets and cutting-edge know-how to improve IS Group's FX and other trading lines and harm ThinkMarkets.  The Eclipse architecture and

engineering are and contain ThinkMarkets' confidential, proprietary, competitive, and trade secret information that Sorenson will inevitably disclose to IS Group in working for IS Group.

80.     *Second*, in addition to Eclipse's proprietary network architecture and engineering, Eclipse runs proprietary code and algorithms that enable Eclipse to rapidly, uniquely, and competitively analyze fast-changing prices and large, fast-evolving information flows and thereby identify trends for managing trading risk, market risk, and hedging strategies.  This includes ThinkMarkets' proprietary sentiment scores and sentiment algorithms that, among other things, allow for the rapid approximative evaluation of a mixture of data that generates unique strategies on which ThinkMarkets manages trading risk, market risk, and hedging strategies and gives ThinkMarkets a competitive edge over IS Group and others in the fintech marketplace. Sorenson's ThinkMarkets job included access to and development of ThinkMarkets' proprietary code and algorithms for Eclipse.  Here too, given the nature of his technology roles at ThinkMarkets and now IS Group, upon information and belief Sorenson, as part of his regular duties for IS Group, will inevitably, at minimum, use ThinkMarkets' confidential, proprietary, and trade-secret know-how for its cutting-edge code and algorithms.  Through Sorenson, IS Group can now wrongly gain and use ThinkMarkets' secret, cutting-edge code and algorithms to mimic ThinkMarkets' proprietary strategies and other trade secrets in its management of trading risk, market risk, and hedging strategies and to harm ThinkMarkets.  ThinkMarkets' proprietary code and algorithms for Eclipse are and contain ThinkMarkets' confidential, proprietary, competitive, and trade secret information that Sorenson will inevitably disclose to IS Group in working for IS Group.

81.     *Third*, apart from Eclipse, Sorenson also wrote proprietary market data feeders for derivative trading products during his ThinkMarkets employment.  This proprietary information and know-how would wrongly reveal to IS Group what data ThinkMarkets successfully uses and

believes is important in its trading (and, equally important, what data is not) as well as how ThinkMarkets has successfully developed, designed, integrated, and used these feeders in its trading business. Again, given the nature of his technology roles at ThinkMarkets and now IS Group, upon information and belief Sorenson, as part of his regular duties for IS Group, will inevitably, at minimum, use ThinkMarkets' confidential, proprietary, and trade-secret know-how for its market data feeders. Through Sorenson, IS Group can now wrongly gain and use ThinkMarkets' secret proprietary market data feeders and harm ThinkMarkets. ThinkMarkets' proprietary market data feeders are and contain ThinkMarkets' confidential, proprietary, competitive, and trade secret information that Sorenson will inevitably disclose to IS Group in working for IS Group.

82.     *Fourth*, Sorenson secured and maintained ThinkMarkets' proprietary client information during his ThinkMarkets employment. At minimum, Sorenson can wrongly reveal to IS Group how ThinkMarkets secures, maintains, and manages client information. Given the nature of his technology roles at ThinkMarkets and now IS Group, upon information and belief Sorenson, as part of his regular duties for IS Group, will inevitably, at minimum, use ThinkMarkets' confidential, proprietary, and trade-secret know-how for securing, maintaining, and managing client information. Through Sorenson, IS Group can now wrongly gain and use ThinkMarkets' proprietary methods for securing, maintaining, and managing client information; this is confidential, proprietary, competitive, and trade secret information that Sorenson will inevitably disclose to IS Group in working for IS Group.

83.     *Fifth*, Sorenson also helped design, build, develop, and maintain ThinkMarkets' proprietary information databases in support of its FX and other trading businesses. This proprietary information and know-how would wrongly reveal to IS Group (i) what data ThinkMarkets successfully uses and believes is important in its trading (and, equally important,

what data is not) and (ii) how ThinkMarkets successfully builds, develops, maintains, and manages data and databases in its trading business. Given the nature of his technology roles at ThinkMarkets and now IS Group, upon information and belief Sorenson, as part of his regular duties for IS Group, will inevitably, at minimum, use ThinkMarkets' confidential, proprietary, and trade-secret know-how for designing, building, developing, and maintaining ThinkMarkets' proprietary information databases. Through Sorenson, IS Group can now wrongly gain and use ThinkMarkets' proprietary database information and know-how and harm ThinkMarkets. ThinkMarkets' database information and know-how are and contain ThinkMarkets' confidential, proprietary, competitive, and trade secret information that Sorenson will inevitably disclose to IS Group in working for IS Group.

84.     These examples are not exhaustive, but merely illustrate the ways in which ThinkMarkets' confidential and trade secret information inevitably will be disclosed by Sorenson to IS Group without appropriate judicial relief.

## SORENSON REFUSES TO RETURN THINKMARKETS' CONFIDENTIAL INFORMATION

85.     On January 11, 2021, ThinkMarkets sent a second letter to Sorenson demanding the return of its confidential and trade secret information and also demanding that Sorenson identify any computers/devices/storage systems that he used to perform work for ThinkMarkets and submit such devices to a third party forensic firm for inspection and imaging. *See* Letter attached as **Exhibit C**.

86.     To date, Sorenson has not agreed to the return of ThinkMarkets' information and has not agreed to the requested submission to a third party forensic firm for inspection and imaging.

## SPECIFIC CLAIMS

## FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

87.     Paragraphs 1 through 86 of this Complaint are fully incorporated herein by reference.

88.     ThinkMarkets entered into a valid and enforceable contract with Sorenson.

89.     ThinkMarkets offered the terms of the contract to Sorenson, and Sorenson accepted such terms.

90.     Sorenson received consideration for signing and entering into his contract.

91.     In his contract, Sorenson specifically warranted and agreed that he would not disclose to any person outside of ThinkMarkets, or use for any purpose other than in furtherance of his legitimate job duties, ThinkMarkets' confidential and trade secret information.  In his contract, Sorenson also warranted and agreed that he would return all of ThinkMarkets' property and confidential information.  In his contact, Sorenson also agreed to abide by certain post-employment non-competition and non-solicitation covenants.

92.     Sorenson has breached his contract.

93.     Without any authorization from ThinkMarkets, Sorenson has failed to return and, upon information and belief, has disclosed ThinkMarkets' confidential and trade secret information.  Upon information and belief, Sorenson also has breached his non-competition obligations by performing for IS Group business activities that are the same as or substantially similar to those he performed for ThinkMarkets within the restricted geographic area(s) within the twenty-four month period after the end of his employment with ThinkMarkets.

94.     ThinkMarkets has performed each and every obligation required of it under the contract.

95.     ThinkMarkets has suffered actual damages as a result of Sorenson's breach of the confidentiality and return of property provisions of his contract.

96.     ThinkMarkets has suffered and will continue to suffer irreparable harm as a direct result of Sorenson's breach of his non-disclosure obligations until such time as he is ordered to cease using ThinkMarkets' confidential and trade secret information.

97.     Injunctive relief is necessary as the recovery of money damages alone would not fully compensate ThinkMarkets for Sorenson's breach of his non-disclosure obligations.

**SECOND CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets – Illinois Trade Secrets Act)**

98.     Paragraphs 1 through 97 of this Complaint are fully incorporated herein by reference.

99.     By virtue of being ThinkMarkets' former Senior Network Engineer and Senior Network Architect, Sorenson knows or has in his possession ThinkMarkets' confidential and trade secret information.  Unauthorized disclosure and misappropriation of such information poses a significant threat to ThinkMarkets' ongoing business.

100.    ThinkMarkets' confidential and trade secret information constitutes trade secrets because ThinkMarkets derives independent economic value from that information, such information is neither generally known nor readily accessible by proper means by other persons who can obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.  Thus, Thinkmarkets' confidential and trade secret information described herein constitutes "trade secrets" within the meaning of the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq*.

101.    Sorenson has misappropriated, threatened to misappropriate, or inevitably will misappropriate and, despite demand by ThinkMarkets, refused to return ThinkMarkets'

confidential and trade secret information and likely has used such information for the benefit of his new employer, ISR.  There is a significant risk that Sorenson has or will inevitably disclose such information to ISR without being restrained.

102.    These actions by Sorenson are in violation of the Illinois Trade Secrets Act.

103.    Sorenson will be unjustly enriched by the misappropriation of ThinkMarkets' confidential and trade secret information and, unless restrained, will continue to use, divulge, and/or otherwise misappropriate ThinkMarkets' confidential and trade secret information.

104.    Sorenson's wrongful conduct will persist unless enjoined by this Court.

105.    ThinkMarkets has suffered actual damages as a result of Sorenson's misappropriation of its confidential and trade secret information.

106.    As a result of the misappropriation or threatened misappropriation of ThinkMarkets' confidential and trade secret information, ThinkMarkets has been injured and faces irreparable injury.  ThinkMarkets is threatened with losing its competitive advantage, its confidential and trade secret information, and goodwill in amounts which may be extremely difficult, if not impossible, to fully determine.

## THIRD CLAIM FOR RELIEF
### (Conversion)

107.    Paragraphs 1 through 106 of this Complaint are fully incorporated herein by reference.

108.    ThinkMarkets has the absolute and unconditional right to its property, including its confidential and trade secret information, and the immediate possession of such property.

109.    Pursuant to his contract, Sorenson agreed to return all of ThinkMarkets' property, including, without limitation, ThinkMarkets' confidential and trade secret information.

110. Sorenson has retained ThinkMarkets' property for his own use and/or in manner inconsistent with ThinkMarkets' ownership of and rights in that property and with the intent to permanently deprive ThinkMarkets of that property and/or negatively or irreparably altering that property so as to devalue or diminish that property and/or its nature/status as confidential, privileged, or trade secret information.

111. Sorenson, without the authorization of ThinkMarkets, wrongfully assumed control, dominion, and/or ownership over ThinkMarkets' property in a manner inconsistent with ThinkMarkets' ownership of and rights in that property.

112. ThinkMarkets has suffered actual damages as a result of Sorenson's acts of conversion.

113. ThinkMarkets has suffered and will continue to suffer irreparable harm as a direct result of Sorenson's acts of conversion.

114. Injunctive relief is necessary as the recovery of money damages alone would not fully compensate ThinkMarkets for Sorenson's acts of conversion.

115. Sorenson's conduct as alleged herein was willful and malicious and entitles ThinkMarkets to recover punitive damages.

## FOURTH CLAIM FOR RELIEF
### (The Defend Trade Secrets Act – 18 U.S.C. §§ 1831-39)

116. Paragraphs 1 through 115 of this Complaint are fully incorporated herein by reference.

117. Sorenson's actions, as described above, constitute violations of one or more provisions of the DTSA.

118. The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or

intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

119. The DTSA further provides that "a court may grant an injunction to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable . . . ." 18 U.S.C. § 1836(b)(3)(A).

120. By engaging in the conduct described above, Sorenson has misappropriated, threatened to misappropriate, or inevitably will misappropriate ThinkMarkets' trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

121. During his employment with ThinkMarkets, Sorenson had access to and knowledge of ThinkMarkets' trade secret information, such as its confidential and proprietary technologies, data, and security, including the networks, data, and technologies constituting, underlying, and supporting ThinkMarkets' proprietary ThinkTrader platform as well as its MetaTrader4, Metatrader5, and other applications. This information constitutes "trade secrets" as that term is defined under the Defend Trade Secrets Act.

122. ThinkMarkets derives economic value and a competitive advantage from the fact that this information is not known to or available to its competitors who could, themselves, derive economic value from its disclosure or use. Because of the value of this information, ThinkMarkets has undertaken reasonable measures to maintain its secrecy as set forth above, including, but not limited to, the use of the Agreement.

123. Sorenson has misappropriated ThinkMarkets' trade secrets because, among other reasons, he (a) acquired the trade secrets while knowing or having reason to know that he was doing so by improper means when he has not returned any information to ThinkMarkets since resigning, and (b) has disclosed or inevitably soon will disclose them without ThinkMarkets' consent to his new employer and competitor. Sorenson has a duty to maintain the confidentiality of the trade secrets he learned from ThinkMarkets.

124.    Upon information and belief, Sorenson is using ThinkMarkets' trade secrets in the course and scope of his employment with ISR or will inevitably use such trade secrets unless restrained.

125.    Sorenson acquired ThinkMarkets' trade secrets through improper means.

126.    ThinkMarkets did not provide Sorenson consent to take or use its trade secrets.

127.    The acts and conduct of Sorenson were willful, malicious, and in reckless disregard of the adverse consequences to ThinkMarkets.

128.    As a direct and proximate result of the conduct of Sorenson, ThinkMarkets is entitled to actual damages in an amount to be determined at trial.

129.    Additionally, ThinkMarkets is entitled to attorneys' fees and exemplary damages in the amount of twice the damages award due to Sorenson's malicious and willful misappropriation.

130.    As a result of the foregoing actions, ThinkMarkets has suffered and will continue to suffer irreparable harm.

131.    ThinkMarkets has no adequate remedy at law to prevent Sorenson's use and disclosure of its trade secret information or to prevent this harm.

132.    ThinkMarkets is entitled to preliminary and permanent injunctive relief to enjoin Sorenson from the disclosure or use of ThinkMarkets' trade secret information in the future. Unless enjoined by this court, Sorenson will continue to use ThinkMarkets' trade secret information to unfairly compete.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

133.    Paragraphs 1 through 132 of this Complaint are fully incorporated herein by reference.

134.     ThinkMarkets placed Sorenson in high-ranking positions during his employment. These positions, including but not limited to the Senior Network Architect position, are positions of trust and confidence, wherein Sorenson was responsible for network engineering and network architecture.   This included working with, creating, and improving ThinkMarkets' networks, data, source code, confidential trading strategies, and technologies constituting, underlying, and supporting ThinkMarkets' proprietary platforms and applications.  Sorenson owed ThinkMarkets a fiduciary duty of loyalty, good faith and fair dealing.

135.     Sorenson violated this duty by deleting a certain IT repository in a proprietary application that stored proprietary code on or about the last day of his employment at ThinkMarkets.  Upon information and belief, Sorenson deleted this repository to cause harm to the business and/or take the latest work with him as he left ThinkMarkets.

136.     Upon information and belief, Sorenson violated this duty by improperly accessing confidential and trade secret information of ThinkMarkets while still employed by ThinkMarkets and retaining that information after the termination of his employment with ThinkMarkets in order to compete with ThinkMarkets despite demand for its return.

137.     As a consequence of Sorenson's actions, ThinkMarkets has suffered harm in the form of the deprivation of its proprietary code and by virtue of Sorenson and potentially IS Group having access to competitively sensitive information, including litigation strategies.

138.     ThinkMarkets is entitled to monetary damages against Sorenson in an amount to be determined at trial.

**WHEREFORE**, ThinkMarkets requests the following relief against Sorenson:

(a)     Entry of temporary, preliminary and permanent injunctive relief providing specific performance of the terms of Sorenson's contract signed and acknowledged by him;

(b)     Entry of temporary, preliminary and permanent injunctive relief prohibiting Sorenson from using or disclosing ThinkMarkets' confidential and trade secret information;

(c)     Entry of temporary, preliminary and permanent injunctive relief requiring Sorenson to identify any and all email accounts, computers, devices, hardware, and media on which he performed work for ThinkMarkets or on which he placed ThinkMarkets' information and to submit all such computers, devices, hardware, accounts, servers, domains, media, and any similar locations to a third party forensic firm for inspection and imaging and removal of any ThinkMarkets' information or code;

(d)     Entry of temporary, preliminary and permanent injunctive relief requiring Sorenson to identify any and all cloud-based or other locations that he used to perform work for ThinkMarkets or on which he placed ThinkMarkets' information and to provide the passwords and any other necessary information to access these locations to a third party forensic firm for inspection and copying;

(e) Entry of judgment in favor of ThinkMarkets and against Sorenson for breach of contract, misappropriation of trade secrets, conversion, violation of the DTSA, violation of the CFAA, and breach of fiduciary duty;

(f)     An award of compensatory damages, double damages for willful misappropriation of trade secrets, punitive damages, costs, attorneys' fees, and any other relief as deemed to be warranted by this Court.

Respectfully submitted,

/s/ *James M. Witz*
_____
James M. Witz

James M. Witz
Todd M. Church
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1100
Chicago, IL  60654
Tel: 312.372.5520
Fax: 312.372.7880

*Attorneys for Plaintiffs*

Dated: January 13, 2021

## **V E R I F I C A T I O N**

In accordance with 28 U.S.C. § 1746, I Nauman Anees verify under penalty of perjury as follows:

1. That I am the CEO of ThinkMarkets, and as such, I have been given the authority to make this Verification on behalf of ThinkMarkets; and

2. That I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations made therein are true and correct, except those which are made upon information and belief, which I believe to be true to the best of my knowledge.

EXECUTED this 13th day of January, 2021.

               Nauman Anees
               ThinkMarkets

4839-8308-8086.2